CALIFORNIA ASSOCIATION OF the PHYSICALLY HANDICAPPED, INC., Appellant,

v.

FEDERAL COMMUNICATIONS COMMISSION, Appellee, Metromedia, Inc., Intervenor.

No. 84–1170.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 15, 1985.

Decided Dec. 10, 1985.

Stanley Fleishman, with whom Larry J. Roberts, David Grosz, Los Angeles, Cal., Charles D. Goldman, Washington, D.C., and Robert Lind, Los Angeles, Cal., were on brief, for appellant.

C. Grey Pash, Jr., Atty., F.C.C., Washington, D.C., for appellee. J. Paul McGrath, Asst. Atty. Gen., Jack D. Smith, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., John J. Powers, III, Margaret G. Halpern, Attys., Dept. of Justice and Gregory M. Christopher, Counsel, F.C.C., Washington, D.C., were on brief for appellee. Bruce E. Fein and Gerald M. Goldstein, Attys., F.C.C., Washington, D.C., also entered appearances for appellee.

Thomas J. Dougherty, with whom Preston R. Padden and Gene P. Belardi, Washington, D.C., were on brief for intervenor, Metromedia, Inc.

Before WALD, GINSBURG and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Dissenting opinion filed by Circuit Judge WALD.

GINSBURG, Circuit Judge.

The Federal Communications Commission (Commission or FCC), in an order released April 10, 1984,[1] granted the "short form" applications of Metromedia, Inc., to transfer over fifty percent of its stock from public shareholders, none of whom held as much as five percent, to John W. Kluge, Metromedia's President and Chief Executive Officer, Chairman of the Board of Directors, and twenty-six percent stockholder.[2] The California Association of the Physically Handicapped, Inc. (CAPH or Association) had filed a petition with the FCC objecting to the transfer and urging the employment of a "long form" application procedure.[3] Evidence uncontroverted before the Commission showed that Kluge had exercised *de facto* control of Metromedia with FCC approval for many years. The Commission held that the shift from *de facto* to *de jure* control by Kluge entailed no "substantial change" in ownership or control;[4] it therefore approved a "short

---

**1.** Metromedia, Inc., 98 F.C.C.2d 300 (1984); *see also* Metromedia, Inc., F.C.C. No. 84–364, 56 R.R.2d 1198 (1984) (denial of petition for reconsideration).

**2.** The Communications Act, 47 U.S.C. § 151 *et seq.* (1982), requires that the FCC follow certain procedures—including the acceptance and consideration of petitions to deny—before approving a transfer unless the transfer "does not involve a substantial change in ownership or control." *Id.* at § 309(c)(2)(B). The Commission has created a "long form" application procedure, which fulfills the statutory requirements, and a "short form" application procedure, for those transfers that fall within the statutory exception. On applications involving transfers

of control, see generally *Storer Communications, Inc. v. FCC,* 763 F.2d 436 (D.C.Cir.1985).

**3.** The Association's petition was joined by Sue Gottfried, acting individually and as a representative of the class of all the deaf and hearing impaired persons within the viewing area of Metromedia's Los Angeles station KTTV–TV. *See* Metromedia, Inc., 98 F.C.C.2d 300, 301 (1984).

**4.** CAPH raised no question as to the fact of Kluge's long-term *de facto* control of Metromedia. Instead, relying upon Metromedia's alleged disregard of the rights and interests of the handicapped in the course of Kluge's stewardship, CAPH asked the Commission to refuse permission for completion of the proposed transfer

form" application procedure.[5] CAPH noticed an appeal to this court from the FCC's rejection of the Association's petition.

CAPH invoked 47 U.S.C. § 402(b)(6), which authorizes judicial review at the instance of any person "who is aggrieved or whose interests are adversely affected by" a Commission order. Intervenor Metromedia has challenged the Association's standing to maintain the appeal,[6] and we would be obliged to consider that threshold matter on our own initiative in any event. *See Juidice v. Vail,* 430 U.S. 327, 331, 97 S.Ct. 1211, 1215, 51 L.Ed.2d 376 (1977).

Supreme Court precedent instructs that the constitutional components of "standing" to invoke judicial review are three: (1) personal injury (2) fairly traceable to the defendant's unlawful conduct and (3) likely to be redressed by the requested relief. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *see Allen v. Wright,* —— U.S. ——, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984). The Association, we rule, has not met the requirement set out second—the causality requirement.[7] We conclude that the injury alleged by CAPH is not fairly traceable to the challenged FCC action—the Commission's consent through short form procedure to the transfer of Metromedia stock—and we dismiss the appeal on that account. *See Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976); *Von Aulock v. Smith,* 720 F.2d 176, 180–81 (D.C.Cir.1983).

CAPH represents persons with physical handicaps. The Association claims injury stemming from Metromedia's alleged long-standing neglect of its responsibilities to the handicapped public, particularly Metromedia's failure to take reasonable steps to make television understandable to the hearing impaired and its failure to exert reasonable efforts to hire the handicapped. CAPH's very account of Metromedia's past performance, however, reveals the vulnerability of the Association's present appeal to this court. The injuries recounted by CAPH plainly do not stem from the FCC's approval of the transfer of ownership to the individual, John W. Kluge, who has in fact controlled Metromedia for many years:

■ The "standing" requirement is that the challenged action *cause* the injury. The Association, however, cannot fairly trace its ongoing injury—either in origin or in endurance—to the transfer in question. Instead, CAPH's real plea is that the transfer will furnish no cure—it will not cause the injury to abate. This will not suffice. Under the test for judicial review that precedent prescribes, the alleged injury—here attributed to Metromedia's inadequate

---

until the FCC acted on the allegations CAPH had raised in petitioning to deny the renewal of Metromedia's license for KTTV–TV in Los Angeles. *See* Metromedia, Inc., 98 F.C.C.2d 300, 303–04 (1984). The Commission, prior to the argument of this appeal, had considered and ruled on the merits of the contentions CAPH indeed did air in license renewal proceedings. *See infra* note 11. CAPH, it appears, was positioned to seek judicial review of that adverse FCC determination.

**5.** The form was "short" only in comparative terms; Metromedia's submissions ran over 600 pages. *See* Brief for Intervenor Metromedia, Inc. at 5.

**6.** Metromedia also challenged CAPH's standing before the Commission. The FCC reported, but did not rule on, Metromedia's assertion that

"petitioners [Gottfried and CAPH] lack the requisite standing, having failed to show that they would suffer actual injury ... as a result of the ... transfer." Metromedia, Inc., 98 F.C.C.2d 300, 304 (1984). *See also infra* note 8.

**7.** Differentiating "[t]he 'fairly traceable' and 're-dressability' components of the constitutional standing inquiry," the Supreme Court observed that the causality inquiry "examines the causal connection between the [defendant's—here, the FCC's] assertedly unlawful conduct and *the* alleged injury, whereas the [redressability inquiry] examines the causal connection between the alleged injury and the judicial relief requested." *Allen v. Wright,* —— U.S. ——, 104 S.Ct. 3315, 3326 n. 19, 82 L.Ed.2d 556 (1984). We had earlier made the same distinction. *See Von Aulock v. Smith,* 720 F.2d 176, 181 (D.C.Cir. 1983).

captioning and hiring efforts—must be fairly traceable to the asserted unlawful conduct of the FCC, *i.e.*, the Commission's "short form" consent to the Metromedia stock transfer. *See Allen v. Wright*, 104 S.Ct. at 3328–29; *Gilmore v. City of Montgomery*, 417 U.S. 556, 566–69, 94 S.Ct. 2416, 2422–24, 41 L.Ed.2d 304 (1974).[8]

■ Application of the causality component of "standing" is not always clear and certain.[9] In this case, however, we find no irrationality or unfairness in applying the criterion, for CAPH's grievance indeed can be aired effectively before both agency and court. Unlike the complainants in such cases as *Allen v. Wright, supra,* and *Simon v. Eastern Kentucky Welfare Rights Organization, supra,*[10] CAPH is not remitted to out-of-court prayers for relief for its alleged injury-in-fact.

CAPH claims aggrievement because Metromedia has not fulfilled its public duty to the handicapped in the operation of its television stations. The Association's complaint is properly and pointedly raised in a license renewal proceeding where, if it is borne out, the Commission could provide effective relief in the form of a refusal to renew the license.[11] In the proceeding at

---

**8.** The Article III restrictions under which this court operates do not, of course, apply to the FCC. The Commission may choose to allow persons without Article III "standing" to participate in FCC proceedings, as it did in this case.

**9.** *Compare, e.g., Allen v. Wright,* —— U.S. ——, 104 S.Ct. 3315, 3328–29, 82 L.Ed.2d 556 (1984), *with id.* 104·S.Ct. at 3336–41 (1984) (Brennan, J., dissenting). *See also Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982) ("concept of 'Art. III standing' has not been defined with complete consistency in all of the various cases decided by this Court").

**10.** In *Allen v. Wright,* —— U.S. ——, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), parents of black children who were attending public schools in districts undergoing desegregation asserted that the Internal Revenue Service had not fulfilled its obligation to deny tax-exempt status to racially discriminatory private schools, and had thereby diminished their children's opportunity to receive an education in desegregated public schools. In *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), representatives of low income individuals claimed that a Revenue Ruling allowing favorable tax treatment to hospitals that did not serve indigents to the extent of the hospitals' financial ability diminished the services that would be available to poor persons. In both cases, the Supreme Court held that the plaintiffs lacked standing. In neither case did the plaintiffs have access to another agency or court proceeding to seek cessation of the allegedly illegal conduct.

**11.** CAPH and its co-petitioner Gottfried would have standing to invoke judicial review of an FCC decision renewing the license of a Metromedia station in face of objection by petitioners that the station neglected the concerns of the handicapped. The causality requirement would be met because the renewal of the license would regenerate the continuing injury that CAPH's constituency suffers as a result of the station's alleged practices: without a license renewal, the Metromedia station would be incapable of continuing those practices.

The stock transfer, we add, does not interfere with CAPH's ability to pursue objections to the renewal of Metromedia's licenses. This is not a case in which the entry of a *new operator* through the device of a transfer or an assignment results in a situation fairly comparable to a license grant. *See, e.g., Citizens Committee to Save WEFM v. FCC,* 506 F.2d 246 (D.C.Cir.1974) (en banc) (assignment of license to new licensee who proposed substantial format change, *i.e.,* from classical to contemporary music); Golden West Associates, No. FCC 85–541 (Oct. 11, 1985). Nor does the transfer threaten to moot past-performance-based objections that might be raised in a licensing proceeding. The Commission, recognizing that the transfer effected no alteration in Metromedia's policies and practices, unequivocally represented that approval of the transfer would in no way prejudice CAPH from challenging license renewal applications for particular Metromedia stations. Metromedia, Inc., 98 F.C.C.2d 300, 307 (1984). Focusing on the availability to CAPH of the standard means of challenging station performance, the Commission found that nothing in the pleadings before it "justifie[d] deviating from [its] usual practice of addressing allegations directed against a specific broadcast station's license renewal application in that context." *Id.*

Indeed, in the license renewal proceedings for Metromedia's Los Angeles television station, Gottfried and CAPH in fact raised objections identical to the ones they tendered to the FCC in this case. The Chief of the Video Services Division, on behalf of the Commission, considered and rejected the petitioners' contentions on the merits and granted the license renewals. *See* Golden West Television, Inc., mimeo 3155 (March 15, 1985), *reprinted in* Supplemental Brief for Intervenor Metromedia, Inc., app. at

hand, by contrast, even if the Commission had denied the transfer application,[12] Metromedia, despite its allegedly bad record, would remain in control of its stations.[13]

In sum, CAPH's alleged injury occurred before, existed at the time of, and continued unchanged after the challenged Commission action. CAPH, therefore, cannot tenably trace the asserted injury to the FCC's approval of Metromedia's transfer application. Rather, the injury CAPH describes traces to the Commission's willingness to grant and renew licenses for stations that, in CAPH's judgment, fail sufficiently to serve and hire the handicapped. CAPH, as the FCC has underscored, has standing to challenge licensing and renewal decisions on the basis of the "aggrievement" it asserts here, but it does not have a stake in the transfer proceeding in ques-

tion of the kind necessary to invoke review by an Article III court.[14]

CONCLUSION

CAPH lacks the injury in fact *caused* by the action at issue that is required by Article III. *See Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2630, 57 L.Ed.2d 596 (1978). We therefore order that the appeal in this case is

*Dismissed.*

WALD, Circuit Judge, dissenting.

I dissent from the panel's conclusion that the California Association for the Physically Handicapped (CAPH) lacks standing to challenge the Federal Communications Commission's (FCC or Commission) approval of a "short form" transfer[1] of more

attachment no. 1. The Commission denied petitions for review. *See* Golden West Television, Inc., F.C.C. No. 85–499 (Sept. 16, 1985), *reprinted in* Supplemental Brief for Intervenor Metromedia, Inc., app. at attachment no. 3. Petitioners, if they are so inclined, may continue that fray in court.

**12.** The dissent observes that the FCC applies the same "public interest" standard in transfer cases as in license cases. *See* dissent at 830–831. This is true but irrelevant. CAPH would have standing in a license renewal proceeding not because of the public interest standard but because of the practical impact of a license renewal. The transfer here does not have a similar impact, *i.e.,* continuance of the challenged conduct does not hinge on whether or not the transfer is approved. Thus, CAPH's standing to contest the renewal of a license hardly qualifies it to challenge the transfer in question.

**13.** The dissent argues that the FCC's refusal to approve the transfer could "contribut[e] to," or "induc[e]" a decision by Metromedia to reform its ways with regard to the handicapped. *See* dissent at 827, 831. One suggested scenario is that other shareholders, if not bought out, might "act[ ] to remedy the harm." *See* dissent at 831. We think the prospect of scattered shareholders, none holding as much as five percent, rising up to defy Kluge in order to aid the handicapped implausible in the extreme. More plausibly, the dissent observes that Metromedia might choose to "reform its practices in order to obtain permission for the transfer." *Id.* at 831. But so might the schools in *Allen v. Wright,* or the hospitals in *Simon v. Eastern Kentucky Welfare Rights Organization,* choose to reform in order to gain or retain favorable tax status. *See supra*

note 10. We are at a loss to discern why the causal relationship between alleged injury and agency conduct was more speculative or attenuated in those cases than it is in this one. The transfer here, like the favorable tax treatment in those cases, we believe, does not the meet the "but for" standard described by the Supreme Court in *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 78, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595 (1978) (alleged injury *would not have* occurred "but for the enactment and implementation of the Price-Anderson Act").

**14.** The dissent's argument basing CAPH's standing on procedural grounds does not alter our conclusion. The dissent apparently acknowledges that CAPH must allege an underlying substantive stake in the result of the decision in order to assert standing based on a procedural default. *See* dissent at 832–833. As the discussion above demonstrates, CAPH has no such stake. CAPH's difficulty regarding standing does not lie in the merits of its arguments concerning the appropriateness of the short form procedure or the legality of Metromedia's practices; rather, it inheres in the fact that the injury asserted lacks the requisite causal link to the challenged FCC decision.

**1.** The Communications Act bars a licensee from transferring or assigning a license "except upon application to the Commission and upon finding by the Commission that the public interest, convenience, and necessity will be served thereby." 47 U.S.C. § 310(d) (1982). The usual, "long form" procedure to be followed in approving a transfer is laid out in § 309 and provides for a

than 50 percent of licensee Metromedia's stock. The majority, embracing a standing argument raised not by the FCC but by licensee Metromedia, overreads the requirements of relevant standing precedent and overlooks an essential purpose of the transfer provisions of the Communications Act, 47 U.S.C. §§ 151 ff. (1982). In my view, CAPH's continuing injury from Metromedia's alleged neglect of its duties to the handicapped "fairly can be traced" to the FCC's decision to permit the short form transfer and is "likely to be redressed" by the requested relief. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). I would therefore find that CAPH has standing.

## I. STANDING PRECEDENT IN A THIRD-PARTY CAUSATION CONTEXT

The majority holds that CAPH lacks standing because its injuries are not fairly traceable to the FCC's approval of Metromedia's transfer application. Its analysis, however, underestimates the ability of this causation requirement to accommodate the fact that the primary source of CAPH's injury is the behavior of licensee Metromedia, although the defendant is the FCC. Plaintiffs such as CAPH can have standing to challenge an agency's "behavior *only as a means* to alter the conduct of a third party, not before the court, who is the direct source of [their] injury." *Common Cause v. Department of Energy*, 702 F.2d 245, 251 (D.C.Cir.1983) (emphasis in original).

In such third-party causation cases, " '[t]he mere fact that ultimate relief to the appellants depends on the actions of third parties does not by itself defeat appellants' standing ...' [although it] 'may make it substantially more difficult to meet the minimum requirement of Article III....' " *Von Aulock v. Smith*, 720 F.2d 176, 181 (D.C.Cir.1983) (citations omitted). The third-party origin of the injury plainly influences both the causation and redressability inquiries, which must inevitably be closely related where the defendant is a regulatory agency. In such cases, the causation analysis must look to whether the agency's past action or inaction affected the third party to such an extent that the agency's actions can be said to have substantially contributed to the third party's injurious behavior. The redressability analysis will similarly look to whether the court's order to the defendant agency will likely affect the third party's actions in an ameliorative direction.[2] Thus, both the causation and redressability analyses turn on the extent of the agency's authority to alter the behavior of the misbehaving third party.

Cases in which the Supreme Court and this court have evaluated third-party causation problems do not yield a single inflexible test for standing, but rather can be sited along a continuum. At one end of the spectrum are those cases in which standing has readily been found because the agency's authority is powerful enough to end the injurious conduct altogether by declaring it illegal.[3] At the other end of the

---

30-day notice period and an opportunity for parties in interest to file petitions to deny. A "short form" procedure, omitting these steps, may be used when the transfer "does not involve a substantial change in ownership or control." 47 U.S.C. § 309(c)(2)(B) (1982).

**2.** *Cf. Von Aulock*, 720 F.2d at 180–81 (the two inquiries are closely related in the agency defendant context when the injury occurs in the future, because both require an assessment of how the third party will respond to the agency's action).

**3.** For example, in *Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 151–52, 90

S.Ct. 827, 829, 25 L.Ed.2d 184 (1970), the Supreme Court held that companies that sell data processing services had standing because their competitive injuries were traceable to an allegedly illegal ruling by the Comptroller of the Currency allowing national banks to offer such services. As described in *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 45 n. 25, 96 S.Ct. 1917, 1927 n. 25, 48 L.Ed.2d 450 (1976), "[t]he complaint in *Data Processing* alleged injury that was directly traceable to the action of the defendant federal official, for it complained of injurious competition that would have been illegal without that action." Similarly, in *International Ladies' Garment Workers' Union v.*

spectrum are those cases in which standing has been denied because the agency's action is only one of many factors whose relative influence on the third party's behavior can only be termed "speculative." [4]

In between are cases, like this one, involving " 'complex interrelationships between private and government activity,' " *Community Nutrition Institute v. Block,* 698 F.2d 1239, 1248 (D.C.Cir.1983), *rev'd on other grounds,* 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984), which must be decided on the facts of the particular trans-

action and the specific statutory authority involved. While the agency action may not be a *sine qua non* of the injury, in the sense that the third party is legally free to pursue its harmful conduct even without the agency's approval, the agency is nonetheless a substantial factor in the plaintiffs' plight because its authority over the third party is sufficiently firm that the harmful conduct is not *likely* to occur if the agency puts its foot down. In such cases the agency becomes a primary determinant and a "fairly traceable" causative agent of the third party's actions.[5]

*Donovan,* 722 F.2d 795 (D.C.Cir.1983), *cert. denied* —— U.S. ——, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984), this court accorded standing to knitted outerwear manufacturers and labor organizations challenging the Secretary of Labor's decision to rescind restrictions on employment of workers in their homes. The court found that the plaintiffs' claimed injuries from unfair competition were fairly traceable to the challenged action because, as in *Data Processing,* the relief sought would make the third parties' injurious conduct illegal. *Id.* at 810–11. *Cf. Von Aulock,* 720 F.2d at 181–84 (employees' injuries due to employers' pension plans were not fairly traceable to an EEOC interpretive bulletin, withdrawal of which would not make the employers' conduct illegal).

4. In *Simon v. Eastern Ky. Welfare Rights Org.,* indigents injured by the denial of hospital services challenged an Internal Revenue Service decision to permit tax-exempt treatment of hospitals without regard to whether they provided care to indigents. The Supreme Court held that the connection between the plaintiffs' injuries and the IRS ruling was "speculative" because the denials of service could "result from decisions made by the hospitals without regard to the tax implications." 426 U.S. at 43, 96 S.Ct. at 1926. In *Allen v. Wright,* parents of black public school children charged that the IRS had not fulfilled its obligation to deny tax-exempt status to racially discriminatory private schools. In denying standing, the Court noted that the chain of causation was even weaker than in *Simon,* requiring a double layer of speculation as to future actions of third parties:

[I]t is entirely speculative ... whether withdrawal of a tax exemption from any particular school would lead the school to change its policies. It is just as speculative whether any given parent of a child attending such a private school would decide to transfer the child to public school as a result of any changes in educational or financial policy made by the private school once it was threatened with loss of tax-exempt status.

104 S.Ct. 3315, 3328–29 (1984) (citation omitted). This court recently held that plaintiffs

claiming economic injury from monetary instability and high interest rates lacked standing to challenge the allegedly illegal composition of the Federal Open Market Committee. *Committee for Monetary Reform v. Board of Governors of the Federal Reserve System,* 766 F.2d 538 (D.C.Cir.1985). As in *Allen v. Wright,* two-tiered speculation was involved as to whether the composition of the Committee was responsible for its adoption of restrictive monetary policies and whether those policies caused the adverse economic conditions which harmed the plaintiffs. *Id.* at 542.

5. In *Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), private utilities could operate nuclear power plants and thus injure the plaintiffs even in the absence of liability limitation agreements executed by the Nuclear Regulatory Commission under the Price-Anderson Act. Plaintiffs had standing to challenge the NRC action, however, because the utilities probably would have stopped operating the plants in response to a cessation of the NRC's actions, since such operation would not initially have occurred "but for the enactment and implementation of the Price-Anderson Act." *Id.* at 78, 98 S.Ct. at 2633. This court relied on *Duke Power* to find standing for consumer organizations challenging the legislative veto of the Federal Trade Commission's proposed used car rule, finding that " 'but for' the veto's intervention, the FTC's used car rule would have secured significant assistance and protection for the used car buyers [that the organizations] represent." *Consumers Union of U.S., Inc. v. FTC,* 691 F.2d 575, 577 (D.C.Cir.1982) (en banc), *aff'd mem.* 463 U.S. 1216, 103 S.Ct. 3556, 77 L.Ed.2d 1402 (1983). In *Community Nutrition Institute,* consumers claimed they were injured by the absence of a lower priced alternative to whole milk and that the injury was traceable to milk market orders issued by the Secretary of Agriculture which effectively raised the price of reconstituted milk. The court found that the injury was traceable to the agency's action, even

The extent to which injuries primarily caused by a third party are "fairly traceable" to the actions of a federal agency defendant thus varies with the extent of the agency's authority over the disputed actions of the third party. Here it turns on the extent of the FCC's authority in a license transfer proceeding. To assess that authority, we must look to the statute.

## II. THE FCC'S POWER OVER TRANSFERS UNDER THE COMMUNICATIONS ACT

The Communications Act requires the FCC to periodically assess and, if necessary, correct a licensee's conduct at several critical points: before it grants an initial license, at renewal proceedings, and as a prerequisite to any major transfer of control or ownership. The panel concedes that licensing, renewal, and some transfer proceedings present an opportunity for the FCC to prevent or abate conduct which injures plaintiffs such as these, and that FCC errors in such proceedings can give rise to standing for dissatisfied viewers. But the majority attempts to draw a distinction between this transfer proceeding and transfer proceedings which are more like grant or renewal proceedings, in order to deny standing in this case while preserving standing in the others. Maj.Op. at 826–827 & n. 11. The panel's attempted distinction is, however, based on a misunderstanding of the FCC's authority over transfers under the Communications Act.[6]

The Communications Act does not distinguish between transfers which are "fairly comparable to a license grant," Maj.Op. at 826 n. 11, and those which are not. The only distinction between transfers made in the Act is between "short form" and "long form" transfers. *See supra* at 827 n. 1.

All transfers involving a substantial change in ownership or control must be treated alike and, indeed, must be treated like license grants and renewals. Grants, renewals, and long form transfers are all governed by the same pre-grant protest procedures in § 309. 47 U.S.C. §§ 309(a), 310(d) (1982). In all of these proceedings, the FCC's decision must be based on a finding that its action would serve the "public interest, convenience, and necessity." 47 U.S.C. §§ 309(a), 310(d). The legislative history of the Communications Act Amendments of 1952 makes it clear that as regards transfers, "in applying the test of public interest, convenience, and necessity the Commission must do as though the proposed transferee or assignee were applying for the ... station license." H.R. Rep. No. 1750, 82d Cong., 2d Sess. 12 (1952), U.S.Code Cong. & Admin.News 1952, 2234, 2246. This court has accordingly concluded that "[a]ssignment applications are subject to the same standards and treated in the same manner as initial license applications unless they do not entail a substantial change in ownership or control." *Citizens Committee to Save WEFM v. FCC*, 506 F.2d 246, 258 n. 15 (D.C.Cir. 1974) (en banc).

The statutory presence of an identical "public interest" standard for judging renewal and transfer cases is thus critical, although the majority refuses to concede its relevance. Maj.Op. at 827 n. 12. The majority, by distinguishing between transfers that involve new operators and those that do not, would limit the focus of transfer proceedings to the proposed transferee. The "public interest" standard which Congress mandated encompasses a much broader range of issues in both renewal and transfer proceedings, however, includ-

---

though plaintiffs could not prove that a reduction in milk handlers' costs would result in lower consumer costs, because plaintiffs reasonably alleged that the milk handlers would pass the savings on to consumers. 698 F.2d at 1247–48.

**6.** The majority also seeks to downplay its denial of standing in this proceeding by noting that CAPH would still have standing in other FCC proceedings involving Metromedia. Maj.Op. at

826 & n. 11. Standing in a particular case is not, however, affected by the existence of standing in another forum or for another plaintiff. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 489, 102 S.Ct. 752, 767, 70 L.Ed.2d 700 (1982) (court cannot find standing for one plaintiff just because no one else would have standing).

ing the transferor/licensee's past behavior.[7] Indeed, in one of the cases the majority uses as an example of a transfer in which CAPH might have standing because it involves a new operator, Maj.Op. at 826 n. 11, CAPH's objections were based largely on the licensee's past behavior. The Commission acknowledged in that case that "a licensee's past programming is a proper matter for consideration when a station is being assigned." *Golden West Associates,* 59 Rad.Reg.2d (P & F) 125, 128 (F.C.C. Oct. 11, 1985). Thus, the FCC's authority in any long form transfer proceeding, as CAPH alleges this one should be,[8] may be exercised to rectify any action by a present or proposed licensee which is not in the public interest.

### III. CAPH HAS STANDING IN THIS CASE

#### A. *Injury Due to Approval of Transfer*

Thus, there is no doubt that the FCC could have refused to approve this transfer of ownership under its § 310(d) powers if it had accepted the allegations of discrimination in CAPH's petition to deny. Instead, the Commission approved the transfer, allowing Metromedia's management to increase its share of the voting stock by more than 50% and nullifying any possibility of other shareholders acting to remedy the harm.[9] CAPH has standing to challenge this approval because the continuation and exacerbation of its alleged injuries are fairly traceable to the FCC's action.

A contrary FCC decision conditioning or denying the transfer could have ended or mitigated CAPH's injury in one of two ways. First, such FCC action could have induced Metromedia to reform its practices in order to obtain permission for the transfer. The Commission itself must see such reform as likely or it would not consider a licensee's past performance in transfer proceedings. *See supra* at 830. Second, such FCC action could clear the way for a different change of ownership to a more beneficent transferee.

While it is of course possible that Metromedia might continue its allegedly harmful conduct even if the FCC conditioned or denied the transfer, that scenario is not *likely* given the large economic benefits of the transfer and the relatively small cost of complying with an FCC order.[10] The Commission's decision to allow the present management to substantially increase its ownership and so solidify its control must inevitably be a *substantial factor* in the licensee's decisions about its future conduct toward the handicapped. CAPH's allegations are thus comparable to those that have given rise to standing in other third-party causation cases. *See supra* at 829–

---

7. The majority incorrectly assumes that complaints about a licensee's past performance are relevant only in renewal proceedings. Maj.Op. at 826 n. 11.

8. In assessing standing, this court must accept as true all allegations in a petitioner's pleadings and construe the pleadings in favor of the petitioner. *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). The fact that the existence of Kluge's de facto control was not controverted by CAPH, Maj.Op. at 826 & n. 4, is irrelevant since CAPH charges that there was a substantial change in ownership, not in control. Pet.Br. at 18.

9. This scenario is not "implausible in the extreme." Maj.Op. at 827 n. 13. Shareholder action could, for example, take the form of a resolution of the type frequently used to raise social policy concerns at annual meetings. Just as plausibly, several small shareholders could pool their stock into a voting block with enough leverage to elect some new directors. *Cf. Storer Communications, Inc. v. FCC,* 763 F.2d 436, 438 (D.C.Cir.1985) (group of minority shareholders collectively owning 5.3% of stock formed a committee to conduct proxy contest to replace entire board of directors).

10. The entire leveraged buy-out, only part of which involves broadcast licensees, is valued at $1.5 billion. Metromedia Br. at 5 n. 4. Even an FCC decision requiring significantly more programming to be close-captioned would add an average of only $2,200 to the cost of each hour of programming, an amount the ABC network has apparently found to be economically feasible. Pet.Supp.Br. at 10. In addition, a change in Metromedia's policies would likely result from FCC denial or conditioning of the transfer because, at present, "despite the absence of any legal obligation, Metromedia has undertaken extraordinary efforts to serve the special needs of hearing impaired and other handicapped persons." Metromedia Br. at 45.

830 & n. 5. Contrary to the majority's assertions, Maj.Op. at 827 n. 13, the connection between the FCC's action and Metromedia's harmful conduct is more than speculative. *Cf.* cases discussed *supra* at 829 n. 4.

The majority's analysis of the standing inquiry here appears to have been confused by the continuing nature of CAPH's injuries. The majority sometimes recognizes that standing can be based on an ongoing injury whose endurance is attributable to the defendant, *see* Maj.Op. at 825, although at other times it seems to assume that agency action must precede injury to meet the causation requirement, *id.* at 825, 833 n. 13. But even an injury which predates an agency action can give rise to standing if the agency perpetuates or exacerbates the injury. The majority acknowledges this in the renewal context, finding that the FCC's failure to halt Metromedia's injurious conduct "would regenerate the continuing injury that CAPH's constituency suffers as a result of the station's alleged practices." Maj.Op. at 826 n. 11. It steadfastly refuses, however, to recognize the same phenomenon in the transfer context. Yet in a transfer proceeding, as in a renewal proceeding, the FCC *must* consider whether the continued operation of the station will serve the public interest, convenience, and necessity. *See supra* at 830–831. Because the FCC has a statutory duty to "cure" injuries to the public interest in either type of proceeding, its failure to do so "regenerates" that injury and it *will* suffice for CAPH to assert that the FCC caused CAPH's injury by failing to cure it. *Cf.* Maj.Op. at 825.[11] CAPH's injury can fairly be traced to the Commission's willingness to grant, renew, *and transfer* licenses for stations that fail sufficiently to serve and hire the handicapped. *Cf.* Maj.Op. at 827. CAPH thus has standing to challenge the FCC's approval of the transfer.

### B. *Injury Due to Use of "Short Form" Procedures*

CAPH also alleges injury stemming from the FCC's denial of procedural rights accorded to those objecting to "long term" transfers under the Communications Act. The Commission's decision to allow use of the "short form" procedure permitted by § 309(c)(2)(B) compounded CAPH's injury by denying it the opportunity to formally petition for denial of the transfer or request a hearing, 47 U.S.C. § 309 (1982), depriving "CAPH, its members, and other interested parties [of] the opportunity to scrutinize, comment, and participate in the proposed transfer, as required by law." CAPH Notice of Appeal, Appendix at 76.

This court has recognized that the FCC's failure to follow procedural requirements required by statute can give rise to standing for parties in interest. *Gardner v. FCC,* 530 F.2d 1086, 1090–91 (D.C.Cir. 1976); *see also National Conservative Political Action Committee v. Federal Election Commission,* 626 F.2d 953, 957–58 (D.C.Cir.1980); *Committee for Full Employment v. Blumenthal,* 606 F.2d 1062, 1065 (D.C.Cir.1979). Of course, a plaintiff complaining about an agency's procedural errors must be "governed, adversely affected, or aggrieved by the substance of the agency decision."[12] *Capital Legal*

---

**11.** Thus, the fact that CAPH's alleged injury "continued unchanged after the challenged Commission action," Maj.Op. at 827, is precisely what gives CAPH standing.

**12.** In *Capital Legal Foundation,* a public interest group alleging injury from an agency's failure to hold notice-and-comment rulemaking was found to lack standing when it conceded that it had suffered no injury from the substance of the underlying agency action. 711 F.2d at 257–60. The majority implies that a group must have a constitutionally cognizable "stake" in the proceeding to have standing. Maj.Op. at 827 n.

**14.** It is far from clear, however, that the decision in *Capital Legal Foundation* required an additional showing of substantive "injury in fact" to confer standing. In denying standing based on the procedural injuries, the opinion speaks of both constitutional "injury in fact" and the prudential "zone of interests" test and never indicates on which it relies. 711 F.2d at 258–60. In the broadcast context, it is long since established that the interests of the listening public are within the zone of interests protected by the Communications Act and that representatives of the public can raise a variety of

*Foundation v. Commodity Credit Corp.,* 711 F.2d 253, 255 (D.C.Cir.1983). Nonetheless, standing for an aggrieved person can be based on procedural injuries whether or not the plaintiff's objections to the substance of the agency action are meritorious. *Committee for Full Employment,* 606 F.2d at 1065; 13 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3531.4 at 433–34 (1984).

Thus, the denial of "long form" procedural rights to CAPH may itself constitute an additional injury sufficient for standing. Congress can create new interests, including procedural rights, the invasion of which gives rise to standing.[13] *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 373, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). Here Congress required the use of specified procedures in transfer proceedings, in part to benefit protestors,[14] and clearly contemplated that the FCC's failure to accord such rights would be subject to judicial review. These procedures, contained largely in § 309,[15] were added to the Act in 1960 to give protestors an "orderly and logical" way to present their objections to the Commission, H.R.Rep. No. 1800, 86th Cong., 2d Sess. 10 (1960), and "an adequate opportunity to urge error on appellate review," S.Rep. No. 690, 86th Cong., 1st Sess. 4 (1959), U.S.Code Cong. & Admin.News 1960, pp. 3516, 3518. *See also* 105 Cong.

Rec. 7779–81 (1959) (remarks of Sen. Magnuson on introducing the bill).

Because CAPH is aggrieved by the underlying transfer, *see supra* at 832 & n. 12, it is injured additionally by the FCC's allegedly illegal decision to use short form procedures. Although when Congress defines an injury, the other requirements of Article III "injury in fact" must still be met, *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 488 n. 24, 102 S.Ct. 752, 767 n. 24, 70 L.Ed.2d 700 (1982), the requirements of causation and redressability as to the procedural injury would easily be met here. The FCC, by denying CAPH an opportunity to file a petition to deny and to request a hearing, surely caused its procedural injury, and by ordering the FCC to give CAPH an *opportunity* to file a petition to deny and to request a hearing, this court could surely remedy that injury. This would be true even if the FCC ultimately did not agree with the merits of CAPH's claims.[16] At a minimum, the denial of these procedural rights exacerbates CAPH's claims of a substantive injury fairly traceable to the actions of the FCC in approving the transfer.

In sum, I would confer standing upon CAPH to appeal the FCC's approval of a transfer involving a substantial change in ownership or control. I do not find any

issues (including employment discrimination) in licensing proceedings. *See Office of Communication of the United Church of Christ v. FCC,* 359 F.2d 994, 1002–06 (D.C.Cir.1966). Thus, CAPH may have independent standing to raise its procedural claims since it is aggrieved by the underlying transfer, *see* 47 U.S.C. § 402(b)(6) (1982), and is within the zone of interests protected by the Communications Act.

13. When Congress expands the scope of injuries for which litigants may seek redress in federal courts, those courts need not be as worried about the separation of powers concerns which underlie standing doctrine. 13A C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3531.13 at 79 (1984); 13 *id.* § 3531.2 at 398. Basing standing on violation of procedural rights explicitly created by Congress thus does not implicate the separation of powers concerns raised by the Supreme Court in *Allen v. Wright,* —— U.S. ——, 104 S.Ct. 3315, 3325, 3329–30, 82 L.Ed.2d 556 (1984).

14. S.Rep. No. 690, 86th Cong., 1st Sess. 2 (1959). The pre-grant protest procedures were also designed to ease the burden on applicants and the Commission. *Id. See also* 105 Cong.Rec. 7779–81 (1959) (remarks of Sen. Magnuson on introducing the bill).

15. The amendments also made changes in the § 405 rehearing procedures in order to ensure objectors a more effective remedy for Commission errors both at the Commission level and in court. S.Rep. No. 690, *supra* note 14, at 829; H.R.Rep. No. 1800, 86th Cong., 2d Sess. 13–14 (1960).

16. *See Committee for Full Employment,* 606 F.2d at 1065 ("Complainants are injured if this procedural right is denied them, regardless of whether their complaint is ultimately found meritorious."). *Accord* 13 C. Wright, A. Miller & E. Cooper, *supra* note 13, § 3531.4 at 433–34.

obstacle to standing in prior Supreme Court standing precedent, and I do find support for it in the legislative scheme Congress mandated for transfers of licenses. The majority today overreaches itself to erect a new barrier to public participation in the broadcast licensing process.[17]

---

17. Were the panel to reach the merits, I would hold that the FCC erred in not finding the leveraged buy-out to effect a substantial change in ownership. While there was no substantial change in control, the statute dictates use of long form procedures if there is a substantial change in *either* ownership *or* control. 47 U.S.C. § 309(c)(2)(B) (1982). A transfer of more than 50% of the voting stock of a company constitutes a substantial change in ownership under the Commission's own precedents, a result reinforced by the Commission's view that shareholders are the real owners of a company. *See Storer Communications, Inc. v. FCC,* 763 F.2d 436, 441–42 (D.C.Cir.1985). A more difficult question would be whether the case should be remanded to the FCC, which has already considered CAPH's allegations as informal objections. I need not express an opinion on this issue, given the disposition by the majority.