COMMITTEE FOR MONETARY REFORM With Various Other Plaintiffs, Appellants,

v.

BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, et al.

No. 84–5067.

United States Court of Appeals, District of Columbia Circuit.

Argued March 22, 1985.

Decided June 28, 1985.

Lawrence Velvel, Washington, D.C., for appellants. John E. McDermott, was on brief.

Sandra M. Schraibman, Atty., Dept. of Justice, Washington, D.C., with whom Richard K. Willard, Acting Asst. Atty. Gen. and Anthony J. Steinmeyer, Atty., Dept. of Justice, Washington, D.C., were on brief, for appellees.

Grasty Crews, II, Washington, D.C., was on brief for the Honorable John Melcher, Member, U.S. Senate, amicus curiae, urging affirmance.

Before ROBINSON, Chief Judge, and EDWARDS and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge.

The question presented in this case is whether private businesses and individuals who allegedly have suffered financial damage as a result of the money supply policies of the Federal Reserve System ("System") have standing to raise constitutional challenges to the exercise of power by the System and to the composition of one of its elements, the Federal Open Market Committee ("FOMC" or "Committee"). The District Court held that the appellants lacked standing, and accordingly dismissed the complaint.[1] We affirm.

## I. BACKGROUND

The Federal Reserve System, established in 1913 as the nation's central bank, is composed of both public and private elements.[2] In addition to the FOMC, the System includes the Board of Governors, the twelve regional Federal Reserve Banks, the Federal Advisory Council, and the approximately 5,500 privately owned commercial banks that are members of the System. Among the principal functions of the Federal Reserve System is the conduct of monetary policy, the aim of which is to promote national economic goals through influence on the availability and cost of bank reserves, bank credit, and money. The three primary means through which the System implements monetary policy are open market operations, regulation of member bank borrowing from the Federal Reserve Banks, and establishment of member bank reserve requirements.

The most important of these methods, open market trading—i.e., the purchase and sale of Government securities in the domestic market—is exclusively the function of the FOMC.[3] The Committee is composed of twelve members: the seven mem-

---

**1.** *Committee for Monetary Reform v. Board of Governors of Federal Reserve Sys.,* No. 83–1730 (D.D.C. Oct. 26, 1983) (Pratt, J.), *reprinted in* Joint Appendix ("J.A.") 322.

**2.** For accounts of the history, structure and operations of the Federal Reserve System and the FOMC, see *Riegle v. FOMC,* 656 F.2d 873, 874–76 (D.C.Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981); *Reuss v. Balles,* 584

F.2d 461, 462–64 (D.C.Cir.), *cert. denied,* 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978); *see also FOMC v. Merrill,* 443 U.S. 340, 343–47, 99 S.Ct. 2800, 2803–06, 61 L.Ed.2d 587 (1979).

**3.** 12 U.S.C. § 263(b) (1982). All statutory references herein are to Title 12 of the United States Code.

bers of the Board of Governors of the Federal Reserve System, who are appointed by the President with the advice and consent of the Senate,[4] and five representatives of the Federal Reserve Banks, who are elected annually by the boards of directors of the Banks from among the Banks' presidents and first vice presidents.[5] The Federal Reserve Banks are private corporations whose stock is owned by the member commercial banks within their districts.[6] The board of directors of each Reserve Bank consists of six members elected by the member commercial banks and three members appointed by the Board of Governors of the Federal Reserve System.[7] The presidents and five vice presidents of the Reserve Banks are selected by the respective boards of directors but are subject to approval, suspension and removal by the Board of Governors.[8] In short, the FOMC consists of seven members who hold their offices by virtue of presidential appointments confirmed by the Senate, and five members who are elected by Reserve Bank boards of directors, and who hold their offices subject to the approval of the Board of Governors.

This is the third occasion in recent years on which we have been presented with a challenge to the composition of the FOMC on the ground that the participation of the five Reserve Bank members violates the Appointments Clause of the Constitution.[9] In *Reuss v. Balles*,[10] we held that a Member of the House of Representatives lacked standing to maintain such an action in his capacity either as a legislator or as a private bondholder. With regard to the latter asserted basis for standing, the court held that the plaintiff had failed to allege specific injury to the value of his financial holdings. The court further stated that, even if the plaintiff could allege a more concrete injury, he would have difficulty establishing that the injury was caused to a sufficient degree by the alleged violation and was likely to be redressed by a favorable decision.[11]

Three years later, in *Riegle v. FOMC*,[12] the court was again presented with the challenge to the composition of the FOMC. In *Riegle*, the court held that a United States Senator had standing on the basis of his asserted right under the Appointments Clause to vote on the nominations of all members of the FOMC.[13] However, the court exercised its equitable discretion to decline to decide the merits of Senator Riegle's claim on the ground that adjudication would improperly interfere with the legislative process by intervening in a dispute that was essentially one between the plaintiff and his fellow legislators.[14]

The present action was filed in the District Court in June 1983 by the Committee for Monetary Reform, a non-profit corporation, and over 800 other corporations, businesses and individuals who alleged that they were "directly affected by the money supply policies of the Federal Reserve System and in particular have been damaged financially by the devastatingly high inter-

4. § 241.

5. § 263(a).

6. § 321.

7. §§ 302, 304.

8. §§ 248, 341.

9. Article II, section 2, clause 2, states, in pertinent part:
   [The President] ... shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

10. 584 F.2d 461 (D.C.Cir.), *cert. denied*, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978).

11. *Id.* at 469.

12. 656 F.2d 873 (D.C.Cir.), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981).

13. *Id.* at 877–79.

14. *Id.* at 881–82.

est rates caused by its policies and by the recession which those policies produced."[15] The complaint charged that, in managing the nation's money supply, the Federal Reserve System had been operating unlawfully in three respects.[16] First, as in *Reuss* and *Riegle*, the plaintiffs claimed that the FOMC exercised significant governmental authority and that all of its members were therefore "Officers of the United States" required to be appointed in the manner prescribed by the Appointments Clause. Second, the complaint charged that the inclusion on the FOMC of members whose selection was ultimately controlled by commercial banks violated due process by delegating authority to individuals directly interested in the operations of the regulatory body. Third, the plaintiffs maintained that four statutes that authorize the Federal Reserve System to control the money supply, 12 U.S.C. §§ 225a, 263, 357 and 462b, "represent an unconstitutional delegation of the Article I, Section 8 power of Congress 'To coin money [and] regulate the value thereof ...' in that neither they nor any other statutes provide any meaningful criteria to guide the administrative exercise of the power so delegated."[17]

The District Court ruled that the plaintiffs lacked standing and therefore granted the defendants' motion to dismiss. Assuming for purposes of analysis that the plaintiffs had suffered injury in fact, the court held that they had failed to allege facts sufficient to support a finding that their injuries were caused by the alleged constitutional violations or that a favorable decision would be likely to redress their injuries.[18] This appeal followed.

## II. STANDING

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."[19] In recent years, the Supreme Court has articulated several constitutional requirements that a litigant must satisfy to establish standing:

> Art. III requires the party who invokes the court's authority to show [1] that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury [2] fairly can be traced to the challenged action and [3] is likely to be redressed by a favorable decision.[20]

In the present case, the appellants advance two theories to support their standing. First, the appellants contend that they have suffered economic harm as a consequence of the alleged constitutional violations. Second, they rely on several cases that have recognized standing under certain circumstances to challenge the authority of agencies on separation of powers grounds. We find both of these theories insufficient to establish standing in this case.

---

**15.** First Amended Complaint for Declaratory and Injunctive Relief ¶ 2, *reprinted in* J.A. 102.

**16.** *Id.* ¶ 1, J.A. 102.

**17.** *Id.* ¶¶ 41–42, J.A. 123–24. Section 225a instructs the Board of Governors and the FOMC to "maintain long run growth of the monetary and credit aggregates commensurate with the economy's long run potential to increase production, so as to promote effectively the goals of maximum employment, stable prices, and moderate long-term interest rates." Section 263(c) directs the FOMC to conduct open market operations "with a view to accommodating commerce and business and with regard to their bearing upon the general credit situation of the country." In similar terms, § 357 requires the Federal Reserve Banks, subject to review by the Federal Reserve Board, to fix the discount rates charged member banks "with a view of accommodating commerce and business." Finally, former § 462b authorized the Board of Governors to change reserve requirements "in order to prevent injurious credit expansion or contraction."

**18.** Slip op. at 5–9, J.A. 326–30.

**19.** *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975).

**20.** *Valley Forge Christian College v. Americans United for Separation of Church & State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations and internal quotations omitted).

### A. *Economic Harm Caused by the Violations*

■ The appellants—who include businesses, building associations, farmers, a labor union, and private individuals—allege that they suffered serious financial damage as a result of monetary instability and high interest rates in recent years.[21] We may assume that these allegations are sufficient to meet the requirement of injury in fact. We agree with the District Court, however, that the appellants have failed to show that their injuries are fairly traceable to the asserted constitutional violations.

In their complaint, the appellants assert in general terms that monetary instability and high interest rates are "a direct result of the participation of the Federal Reserve Bank representatives ... in the policymaking function of the Federal Open Market Committee" and of the "unconstitutional delegation of legislative power" to the Federal Reserve System.[22] As developed in their declarations and briefs, the appellants' theory of causation apparently runs as follows. Although the Reserve Bank members are a minority on the FOMC, they play a significant role in the FOMC decisionmaking process, which operates by consensus. The participation of members who are unaccountable to democratic control, and who represent the interests of commercial banks, leads to FOMC decisions to reduce or limit the growth of the money supply. The implementation of such decisions, in turn, inevitably leads to higher interest rates, which are driven yet higher by uncertainty over the future value of money caused by the unrestricted delegation of power to the Federal Reserve System. Finally, high interest rates immediately cause the appellants' injuries.[23]

In our view, "[t]he links in the chain of causation between the [alleged constitutional violations] and the asserted injury are far too weak for the chain as a whole to sustain [the appellants'] standing."[24] It is entirely speculative whether the influence of the Reserve Bank members is responsible for the FOMC's alleged pursuit of restrictive or erratic monetary policies. Moreover, in light of the complexity of the modern economy, it is also highly uncertain whether and to what extent such policies were responsible for the adverse economic conditions that allegedly resulted in harm to the appellants. Similarly, the appellants have given no indication as to how they can succeed in establishing that an overly broad delegation of power to the Federal Reserve System has had the consequence of undermining economic certainty and thereby increasing interest rates. Such general assertions are clearly inadequate to meet the constitutional requirement that parties allege specific facts sufficient to establish that their injuries are fairly traceable to the alleged violations. We think that courts lack both the competence and the authority to determine such abstract issues, which are better addressed through political and economic debate over the role of monetary policy in the national economy.

Similarly, we think that the District Court correctly concluded that the appellants had failed to show that their injuries were likely to be redressed by the requested relief. The appellants maintain that,

> once the [Reserve Bank members] no longer are empowered to influence the growth or contraction of the money supply (and thence the value of the dollar), and control is revested in persons subject to the democratic process, then the value of the dollar will be regulated according to the public interest, and not according to the interest of commercial banks. This will have two salutary effects on interests of appellants herein. First, with control over the money supply vested in individuals who do not work for those who profit by high interest rates,

21. Amended Complaint ¶¶ 8–16, J.A. 104–16.

22. *Id.* ¶¶ 26, 43, J.A. 119, 124.

23. *See* Brief for Appellants at 10–12, 41–45, 49–51; Declaration of Robert D. Auerbach, J.A. 256.

24. *Allen v. Wright,* —— U.S. ——, 104 S.Ct. 3315, 3329, 82 L.Ed.2d 556 (1984).

there will be less incentive for high interest rates to be "mandated" by artificial contraction of the money supply. Second, when democratic control over the money supply is brought about, there will be renewed confidence on the part of those who lend money as to the future value of the dollar, thus bringing about lower interest rates because there will be no need to "hedge" against future manipulation of the value of the dollar by private parties.[25]

We find these contentions far too speculative to meet the redressability requirement.

Accordingly, we conclude that the appellants' allegations that they have suffered economic harm as a consequence of the alleged constitutional violations is insufficient to support their standing in this case.

## B. Challenge to Agency Authority on Separation of Powers Grounds

■ Alternatively, and in our view more tenably, the appellants seek to base their standing on the principle articulated in *Buckley v. Valeo*,[26] in which the Supreme Court, sustaining a challenge to the composition of the Federal Election Commission on Appointments Clause grounds, held that "[p]arty litigants with sufficient concrete interests at stake may have standing to raise constitutional questions of separation of powers with respect to an agency designated to adjudicate their rights."[27] In order to establish standing under this princi-

ple, a party is not required to show that he has received less favorable treatment than he would have if the agency were lawfully constituted and otherwise authorized to discharge its functions.[28]

■ We do not read *Buckley v. Valeo* to establish a principle of standing broad enough to encompass the appellants. By contrast to the litigants in *Buckley*, the appellants here do not allege they are directly subject to the governmental authority they seek to challenge, but merely assert that they are substantially affected by the exercise of that authority.[29] We believe that to allow all persons indirectly affected by an agency's decision to challenge its constitutional authority would open up the courts to " 'generalized grievance[s]' shared in substantially equal measure by all or a large class of citizens," and thereby require the courts "to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights."[30] Consequently, we conclude that litigants have standing to challenge the authority of an agency on separation-of-powers grounds only where they are directly subject to the authority of the agency, whether such authority is regulatory, administrative, or adjudicative in nature.[31] In the present case, it is clear that

25. Brief for Appellants at 44–45.

26. 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam).

27. *Id.* at 117, 96 S.Ct. at 681 (citing *Palmore v. United States,* 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973); *Glidden Co. v. Zdanok,* 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962); *Coleman v. Miller,* 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939)).

28. *See, e.g., Glidden Co.,* 370 U.S. at 533, 82 S.Ct. at 1463 (plurality opinion) ("The claim advanced by the petitioners, that they were denied the protection of judges with tenure and compensation guaranteed by Article III, has nothing to do with the manner in which either of these judges conducted himself in these proceedings.... Article III, § 1, ... is explicit and gives the petitioners a basis for complaint with-

out requiring them to point to particular instances of mistreatment in the record.").

29. *See* Brief for Appellants at 44.

30. *Warth v. Seldin,* 422 U.S. at 499, 500, 95 S.Ct. at 2205, 2206.

31. *See, e.g., Buckley,* 424 U.S., at 110–13, 96 S.Ct. at 678–80 (describing the extensive rulemaking, adjudicative and enforcement powers of the FEC); *Glidden Co.,* 370 U.S. 530, 82 S.Ct. 1459 (recognizing standing of civil and criminal defendants to challenge jurisdiction of judges on ground that they lack Article III tenure and salary protections); *Andrade v. Lauer,* 729 F.2d 1475, 1494–96 (D.C.Cir.1984) (employees adversely affected by reduction in force have standing to raise Appointments Clause challenge to authority of agency officials).

the FOMC and the Federal Reserve System in no way exercise direct governmental authority over the appellants. We therefore conclude that the *Buckley* principle fails to support the appellants' standing in the present case.

### III. CONCLUSION

Because the appellants are unable to establish either that their financial losses are fairly traceable to the asserted constitutional violations or that they are directly subject to the agency authority they seek to challenge, we hold that they lack standing to maintain the present action.

Contrary to the appellants' contentions, our decision in *Riegle v. FOMC*[32] does not compel a different result. In *Riegle*, the court ruled that a United States Senator had standing as a legislator to challenge the composition of the FOMC, but declined to adjudicate the merits of the action under the doctrine of equitable discretion, viewing the dispute as primarily one between the plaintiff and his fellow legislators.[33] While the court based its decision primarily on the ground that "judicial action would improperly interfere with the legislative process,"[34] the court also relied on the likelihood that a private plaintiff could acquire standing to raise a similar claim without implicating the separation-of-powers concerns that counseled dismissal of a legislative plaintiff.[35]

In *Riegle*, however, no private plaintiff was before the court, and the decision therefore does not constitute a direct holding that private plaintiffs have standing in such a case. Instead, *Riegle* stated only that it was "probable" that such plaintiffs could obtain standing.[36] In making this assumption, moreover, the court did not analyze the issue under the constitutional standards governing standing.[37] As we have shown, application of those standards requires the conclusion that the appellants lack standing.[38] Accordingly, the judgment of the District Court dismissing the action is

*Affirmed.*

---

**32.** 656 F.2d 873 (D.C.Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981).

**33.** *Id.* at 881.

**34.** *Id.* at 882.

**35.** *Id.* at 881–82.

**36.** *Id.* at 881.

**37.** We note that *Riegle* was decided prior to the Supreme Court's most recent articulations of the constitutional requirements for standing in *Valley Forge* and *Allen v. Wright.*

**38.** The appellants, interpreting *Riegle* and subsequent decisions to hold that dismissal of a legislator's action under the doctrine of equitable discretion is appropriate only where a private plaintiff would have standing to raise the constitutional issue, contend that, if they are held to lack standing, a subsequent action brought by a Senator may not be dismissed on prudential grounds. Brief for Appellants at 5–7, 45–49. We find it unnecessary to speculate on the appropriate disposition of such a case, and accordingly express no opinion on the question, the resolution of which must await another day.