John **MELCHER**, Plaintiff,

v.

**FEDERAL OPEN MARKET COMMITTEE, et al.,** Defendants.

Civ. A. No. 84–1335.

United States District Court, District of Columbia.

June 5, 1986.

Supplemental Opinion Sept. 25, 1986.

Grasty Crews, II, Falls Church, Va., for plaintiff.

Brook Hedge, Sandra M. Schraibman, Alfred Mollin, Mona Butler, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendants; Michael Bradfield, General Counsel, Bd. of Governors of the Federal Reserve System and the Federal Open Market Committee, John H. Oltman, General Counsel, Federal Reserve Bank of New York and Deputy General Counsel, Federal Open Market Committee, of counsel.

## OPINION

HAROLD H. GREENE, District Judge.

United States Senator John Melcher of Montana, the plaintiff in this action, has challenged the process by which five mem-

bers of the Federal Reserve Board's Federal Open Market Committee (hereinafter FOMC) are selected. The gravamen of his complaint is that these five members, known as the "Reserve Bank members," are selected in violation of the appointments clause, Article II, § 2, cl. 2 of the Constitution, because they are selected by the boards of directors of the several Federal Reserve Banks—private individuals—rather than by the President of the United States with confirmation by the Senate. *See* 12 U.S.C. § 263(a).[1]

The adjudication of Senator Melcher's cause has travelled a long and somewhat tortuous course, due essentially to recent changes in the state of the law in this area. Thus, the action had to be stayed September 26, 1984, pending the appeal in *Committee for Monetary Reform v. Board of Governors*, No. 83–1730 (D.D.C. Oct. 26, 1983), *aff'd*, 766 F.2d 538 (D.C.Cir.1985), which was claimed to be dispositive of the issues here. The decision in that case, when it was issued, was found to be in significant tension with an earlier case, *Riegle v. FOMC*, 656 F.2d 873 (D.C.Cir.

1981), and this necessitated new submissions and a hearing on the motion to dismiss. Between *Riegle* and *Committee for Monetary Reform*, the Supreme Court decided *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), which also had an impact on the issues here, and finally, the recent decision in *Synar v. United States*, 626 F.Supp. 1374 (three judge court), *prob. juris. noted, Bowsher v. Synar*, —— U.S. ——, 106 S.Ct. 1181, 89 L.Ed.2d 298 (1986), generated still another round of pleadings from the parties and required renewed consideration by the Court.

After consideration of numerous submissions by all parties, and after hearing, the Court now decides the question of Senator Melcher's ability to pursue his claim in federal court.

I

■ Supreme Court pronouncements establish a two-part test for standing questions. A litigant must (1) allege a "distinct and palpable" injury to himself; and (2) show that the injury is " 'fairly' traceable to the challenged action" and that it is

1. The operations of the FOMC, and the methods by which its members are appointed, have been comprehensively described by the Court of Appeals for this Circuit:

> The Federal Reserve System, established in 1913 as the nation's central bank, is composed of both public and private elements. In addition to the FOMC, the System includes the Board of Governors, the twelve regional Federal Reserve Banks, the Federal Advisory Council, and the approximately 5,500 privately owned commercial banks that are members of the System. Among the principal functions of the Federal Reserve System is the conduct of monetary policy, the aim of which is to promote national economic goals through influence on the availability and cost of bank reserves, bank credit, and money. The three primary means through which the System implements monetary policy are open market operations, regulation of member bank borrowing from the Federal Reserve Banks, and establishment of member bank reserve requirements.
>
> The most important of these methods, open market trading *i.e.,* the purchase and sale of Government securities in the domestic market—is exclusively the function of the FOMC. The Committee is composed of twelve members: the seven members of the Board of Governors of the Federal Reserve System, who are appointed by the President with the advice and consent of the Senate, and five representatives of the Federal Reserve Banks, who are elected annually by the boards of directors of the Banks from among the Banks' presidents and first vice presidents. The Federal Reserve Banks are private corporations whose stock is owned by the member commercial banks within their districts. The board of directors of each Reserve Bank consists of six members elected by the member commercial banks and three members appointed by the Board of Governors of the Federal Reserve System. The presidents and five vice presidents of the Reserve Banks are selected by the respective boards of directors but are subject to approval, suspension and removal by the Board of Governors. In short, the FOMC consists of seven members who hold their offices by virtue of presidential appointments confirmed by the Senate, and five members who are elected by Reserve Bank boards of directors, and who hold their offices subject to the approval of the Board of Governors.

*Committee for Monetary Reform v. Board of Governors of the Federal Reserve System*, 766 F.2d 538, 539–40 (1985) (footnotes omitted).

capable of being redressed by a favorable decision. *Allen v. Wright, supra,* 104 S.Ct. at 3325; *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472–73, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982); *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975).

The first prong of this test may be termed the "injury" requirement, while the second constitutes the "causation" requirement. *See Allen v. Wright, supra,* 104 S.Ct. at 3326 n. 19.

The standing doctrine is, of course, one means for limiting court intervention to the resolution of those controversies envisioned by the framers of Article III. The courts' role in the constitutional scheme consists of deciding highly particularized disputes between individual litigants and avoiding broad public policy determinations that are more appropriately made by the political branches. The injury requirement ensures that the judicial process will be "more than a vehicle for the vindication of the value interests of concerned bystanders," *Valley Forge College, supra,* 454 U.S. at 473, 102 S.Ct. at 759 (quoting *United States v. SCRAP,* 412 U.S. 669, 687, 93 S.Ct. 2405, 2415, 37 L.Ed.2d 254 (1973)); the causation requirement "tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Id.* 454 U.S. at 472, 102 S.Ct. at 758.

 If plaintiff is correct that five members of the FOMC exercise their powers in derogation of the Constitution's appointments clause, the injury suffered by the United States Senate as an institution is fairly obvious: that body is deprived of its constitutionally delegated power to review the credentials of persons exercising executive authority. *See Moore v. U.S. House of Representatives,* 733 F.2d 946, 951 (D.C. Cir.1984); *Riegle v. FOMC,* 656 F.2d 873, 878 (D.C.Cir.1981); *Kennedy v. Sampson,* 511 F.2d 430, 435 (D.C.Cir.1974). Senator Melcher's individual standing to assert the Senate's interest in safeguarding its confirmation power has been sustained in a case that is—on the standing issue at least—on all fours with this one:

> [A]ssuming that the five Reserve Bank members of the FOMC are officers who must be appointed with the advice and consent of the Senate, [an individual Senator's] inability to exercise his right under the Appointments Clause of the Constitution is an injury sufficiently personal to constitute an injury-in-fact.

*Riegle v. FOMC,* 656 F.2d at 878. *See also, Moore v. U.S. House of Representatives, supra,* 733 F.2d at 951–53 (individual members of House possessed standing to challenge origination of revenue bill in Senate). The conclusion that standing exists in this case is buttressed by *Synar v. United States, supra,* 626 F.Supp. at 1374. *Synar* held that members of Congress could challenge an automatic deficit reduction procedure,[2] on the ground that the procedure granted to the Comptroller General and the President power to nullify the members' votes on appropriations legislation.[3] *Synar v. United States,* 626 F.Supp. at 1381–82.

The existing procedure for appointing FOMC members, if unconstitutional, similarly deprives Senator Melcher of his vote for or against confirmation. The fact that *Synar* involved a nullification of prior votes, while this case involves a deprivation

---

**2.** *See* Balanced Budget and Emergency Deficit Control Act of 1985, Pub.L. No. 99–177, 99 Stat. 1037. Although standing to members of Congress was conferred in the statute itself, Congress obviously lacks the ability to expand the constitutional aspects of standing analysis. Thus, *Synar* buttresses the conclusion that constitutional standing is present, even though it would not be an obstacle to "prudential" standing limitations imposed by the federal courts on their own power, including "equitable discretion." *See, e.g., Allen v. Wright, supra,* 104 S.Ct. at 3324–25. The Court relies upon *Riegle* and *Moore* in concluding that prudential considerations ought not to be applied to bar standing here.

**3.** The deficit reduction bill was ultimately declared unconstitutional on other grounds.

of Melcher's right to vote in the first instance, is a distinction without difference. In either case, the plaintiff suffers a " 'specific and cognizable' [injury] arising out of an interest 'positively identified by the Constitution.' " *Id.* (*quoting United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1381 (D.C.Cir.1984) (*quoting Moore v. United States House of Representatives, supra*, 733 F.2d at 951)). Just as the automatic deficit reduction act "interfere[d] with [plaintiffs'] 'constitutional duties to enact laws regarding federal spending,' " *id.*, so the invalid appointment of FOMC members interferes with Senator Melcher's constitutional right and duty to advise and give consent to executive appointments. *See also, Crockett v. Reagan*, 720 F.2d 1355, 1357 (D.C.Cir.1983) (Bork, J., concurring) (action which nullifies or diminishes congressman's vote creates injury-in-fact necessary for standing).

The causation prong of the analysis is more difficult, but also leads to a conclusion that standing exists. The gravamen of Senator Melcher's complaint is that 12 U.S.C. § 263(a) is unconstitutional, and that the defendants in this action, who were appointed pursuant to that section, cannot legally exercise the powers they have adopted.

To be sure, it can be argued that the defendants' allegedly illegal exercise of executive power is not the direct cause of plaintiff's injury, for it is the *appointment* of these defendants without the Senate's advice and consent, rather than their activities after appointment, that directly causes the injury. On this basis, it could be said that the only proper defendants in this case are the directors of the Federal Reserve banks who appointed these defendants.

The Court of Appeals has previously addressed this argument and rejected it. *Riegle v. FOMC, supra*, 656 F.2d at 879 (D.C.Cir.1981). The court noted that the causation prong of the standing analysis is satisfied where it is shown that "prospective [judicial] relief will remove the harm." *Id.* (quoting *Warth v. Seldin, supra*, 422 U.S. at 498–99, 95 S.Ct. at 2204–05). A

declaration that appointments under section 263(a) are unconstitutional would, quite obviously, constitute an advisory opinion if it did not also amount to a declaration that persons appointed under that section have no lawful authority and can be enjoined from exercising executive powers. Thus, it was proper for Senator Melcher to name the Reserve Bank members of the FOMC in his complaint.

His failure also to name the persons purportedly exercising an illegal appointment power does not deprive him of standing, where the named defendants satisfy both rationales underlying the Supreme Court's standing pronouncements, for two reasons. First, the named defendants, like Senator Melcher, have a very real stake in the outcome of the dispute. They are far more than "concerned bystanders," *Valley Forge College, supra*, 454 U.S. at 473, 102 S.Ct. at 759 (quoting *United States v. SCRAP, supra*, 412 U.S. at 687, 93 S.Ct. at 2415); rather, they are the most obvious beneficiaries of the disputed appointments process. Second, invalidation of section 263(a) will, for the reasons already stated, necessarily deprive the defendants of their powers, a result that certainly qualifies as "a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Id.* 454 U.S. at 472, 102 S.Ct. at 758.

## II

That brings the Court to the most difficult question in this case: whether it should invoke the doctrine known as equitable discretion laid down by *Riegle v. FOMC, supra*, and decline to entertain the lawsuit notwithstanding the fact that the Senator possesses Article III standing.

In *Riegle*, Senator Donald W. Riegle, Jr., of Michigan, brought a suit that is identical to this one in all pertinent respects. Like Senator Melcher, Senator Riegle sued the FOMC and its Reserve Bank members, alleging that 12 U.S.C. § 263(a) violates the appointments clause and seeking an injunction against the exercise of voting powers by the individual defendants. The Court of

Appeals ruled that Senator Riegle had standing to sue. 656 F.2d at 878–79. But because frequent attempts had been made in Congress to change the manner of selecting FOMC members, the court stated that it was wary of allowing a legislator to seek resolution of disputes with his legislative colleagues by suing in the courts on a hotly contested issue. Without denying standing, therefore, the court exercised a concept known as "equitable discretion" to dismiss the action. *Id.* at 879–82.

Significantly, however, the court limited its concept of equitable discretion as follows: legislators will be denied access to the courts only when private plaintiffs are available to bring the type of suit brought by the legislator.[4] The court dismissed Riegle's suit because there were many private plaintiffs available: "a major corporation, pension fund, or other major investor." *Id.* at 881.

In a subsequent Court of Appeals case, *Committee for Monetary Reform v. Board of Governors, supra,* 766 F.2d 538 (D.C.Cir.1985), the court heard a challenge to the FOMC brought by the very private plaintiffs it had intimated were available when it decided *Riegle.* Notwithstanding the *Riegle* statement, the court denied them standing, holding that the connection between their injury (high interest rates) and the alleged constitutional violation (the appointment process employed to select FOMC members) was simply too tenuous to support standing under recent Supreme Court decisions. In the view of the court, the plaintiffs could not show that a different appointment process would produce different members who would adopt different interest rate policies. *Id.* at 542.[5]

The Court of Appeals could not appropriately resolve the tension between *Riegle* and *Committee for Monetary Reform* because no congressional plaintiffs were present in the latter case. This Court, however, must address the obvious inconsistency between the two decisions. If both precedents are mechanically applied, the result is that section 263(a) is immune from constitutional attack. Private plaintiffs lack standing to challenge it,[6] and congressional plaintiffs are barred by the doctrine of equitable discretion. This result was clearly not contemplated by the *Riegle* court, which squarely grounded its holding on the assumption that "a similar action could be brought by a private plaintiff." *Riegle, supra,* 656 F.2d at 882. Nor was it accepted by the *Committee for Monetary Reform* court, which noted that "*Riegle* was decided prior to the Supreme Court's most recent [standing] articulations." 766 F.2d at 544 n. 37. The *Committee for Monetary Reform* court was fully aware of the argument that its denial of standing to private plaintiffs might mean that "a subsequent action brought by a Senator may not be dismissed on prudential grounds," but "express[ed] no opinion

---

**4.** The Court also required that legislative redress be available to a congressional plaintiff before equitable discretion could apply. Here, there is no question that a statutory change would moot Senator Melcher's lawsuit, so the only element of the doctrine this Court need address is the availability of non-congressional plaintiffs.

**5.** In a footnote 37 to the opinion, the court attempted to reconcile its two decisions, noting that when *Riegle* was decided several key Supreme Court decisions on standing—*Valley Forge Christian College v. Americans United for Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), and *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)— had not yet been issued. The obvious suggestion was that if the *Riegle* court had known that corporations, pension plans, and the like lacked

standing, it would not have exercised equitable discretion.

**6.** The *Riegle* court grounded its exercise of equitable discretion on the assumption that:

"A person with significant economic interests in the open securities markets and prime lending rates, *e.g.,* a major corporation, pension fund, or other major investor, might qualify for standing to challenge the constitutionality of a procedure which allegedly permits improperly appointed officials to so substantially influence the monetary policy of the United States, open market trading, and prime rates."

656 F.2d at 881. Each of these hypothetical private plaintiffs was an actual plaintiff in *Committee for Monetary Reform,* and all were denied standing.

on the question, the resolution of which must await another day." *Id.* at 544 n. 38.[7]

That day has now arrived. Fortunately, the task of reconciling two seemingly conflicting precedents is less difficult than at first appears. It is apparent that the law of standing has changed substantially since the time when *Riegle* was decided, and those changes have been most significant for plaintiffs such as those who brought *Committee for Monetary Reform*. Thus, while it is arguable whether private plaintiffs could have survived a careful standing analysis when *Riegle* was decided, it is beyond question that private plaintiffs lack

standing to challenge the FOMC and its Reserve Bank members today, after the Supreme Court's decision in *Valley Forge*,[8] and *Allen v. Wright*.[9]

*Valley Forge* and *Allen v. Wright* both make clear that standing by private parties will not be supported by a *possibility* that judicial action can redress plaintiff's injury. Certainty in the causal chain between plaintiff's injury, defendant's conduct, and judicial relief altering that conduct must be present. That refinement in the court's standing analysis was not obvious when *Riegle* was decided.[10]

7. The propriety of exercising equitable discretion when no private plaintiff is available to challenge the constitutionality of legislation was likewise left open in *Gregg v. Barrett,* 771 F.2d 539, 544 (D.C.Cir.1985). *Vander Jagt v. O'Neill,* 699 F.2d 1166 (D.C.Cir.1983), which involved congressional plaintiffs' direct challenge to the internal workings of the House, is plainly distinguishable from the case before this Court.

8. In *Valley Forge, supra,* the Court clarified its previous standing decisions in cases like *United States v. SCRAP.* In particular, the Court stressed that the presence of a legitimate injury and a means of judicial redress were insufficient to confer standing on plaintiffs who could not show that they themselves were both injured and likely to benefit from judicial action. 454 U.S. at 486–87, 102 S.Ct. at 765–66. The Court found that plaintiffs residing in Maryland and Virginia could not challenge the federal government's transfer of property to a religious entity in Pennsylvania. There was no suggestion that plaintiffs' tax liability would in fact be lowered if the government revoked the transfer, just as there was no showing that plaintiffs would personally benefit if the government kept the property. The only "injury" to plaintiffs that would be redressed by judicial action was the "psychological" injury "presumably produced by [plaintiffs'] observance of conduct" violative of the establishment clause. *Id.* at 485, 102 S.Ct. at 765. That was deemed to be not enough. This is similar to *Committee for Monetary Reform* where the private plaintiffs could not show that "monetary instability and high interest rates," the injuries they allegedly suffered, would diminish if the court declared section 263(a) unconstitutional. 766 F.2d at 542. It is entirely possible that new members of the FOMC, appointed with Senate advice and consent, would maintain the same policies as their predecessors. *Id.*

9. In *Allen v. Wright, supra,* parents of public school students alleged that the Internal Revenue Service was illegally granting tax-exempt

status to private schools that practiced discrimination, and that the requisite injury could be inferred from the probability that tax subsidies to the private schools enabled the latter to draw from the public school system white students who might otherwise attend public school with the plaintiffs' children. The Court ruled that plaintiffs lacked standing, because their allegations that illegal tax exemptions caused the public schools to remain segregated, and that judicial action to remove the private schools' tax-exempt status would tend to desegregate the public schools, were "entirely speculative." 104 S.Ct. at 3328–29. Plaintiffs could not prove that withdrawal of the tax exemptions would end discrimination policies at the private schools, nor could they establish that it would lead to racial desegregation of the public schools. The injury suffered by plaintiffs' children might be lessened by judicial action, or it might not.

10. The Supreme Court's standing decisions in cases like *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), could then have supported a conclusion that some of the plaintiffs in *Committee for Monetary Reform* possessed standing to challenge FOMC appointments. In *SCRAP,* it was held that an unincorporated association of five law students had standing to challenge changes in rail rates fixed by the Interstate Commerce Commission. The students believed that increased rail rates would injure the materials recycling industry and that less recycling would mean more pollution, greater consumption of natural resources, increased prices for consumer goods and higher taxes to finance waste disposal. *Id.* at 678, 93 S.Ct. at 2411. The students further alleged that they used "the forests, streams, mountains and other resources in the Washington metropolitan area" for recreation, and that "this use was disturbed by the adverse environmental impact caused by a rate increase...." *Id.* at 685, 93 S.Ct. at 2415. Despite the obviously tenuous connection among the plaintiffs' personal inju-

Accordingly, *Riegle* itself impels this Court to conclude that equitable discretion may not appropriately be applied to deny standing to plaintiff in this case, inasmuch as no private plaintiff is available to enforce the appointments clause of the Constitution. Under those circumstances, this Court would be acting well beyond its authority if it declined to hear Senator Melcher's case.[11] The Court's discretion to refuse a constitutionally proper plaintiff access to. the courts, because of legitimate separation of powers concerns, is not so broad that the Court may abdicate its own role in the constitutional scheme and effectively immunize section 263(a) from any judicial review whatsoever. *See Marbury v. Madison,* 1 Cranch 137, 176, 2 L.Ed. 60 (1803) ("[i]t is, emphatically, the province and duty of the judicial departments to say what the law is").

## SUPPLEMENTAL OPINION

United States Senator John Melcher of Montana, the plaintiff in this action, has challenged the process by which five of the twelve members of the Federal Reserve Board's Federal Open Market Committee (FOMC or Committee) are appointed. The gravamen of his complaint is that these five members, known as the "Reserve Bank members," are selected in violation of the Appointments Clause, Article II, § 2, cl. 2, of the Constitution, because they are chosen by the boards of directors of the several Federal Reserve Banks—private individuals—rather than by the President of the United States. 12 U.S.C. § 263(a). As a consequence, it is said, Senator Melcher and the other members of the United States Senate are improperly prevented from exercising with respect to these persons the advice and consent responsibility they possess under the Constitution.

The Court has previously rejected the government's [1] argument that the Senator lacks standing to bring the action,[2] and it is now considering the merits. Upon such consideration, the Court concludes that section 263(a) does not violate the Appointments Clause, and it will therefore grant summary judgment to the defendants.

## I

The Court of Appeals for this Circuit has described the operations of the Federal Open Market Committee, and the methods by which its members are appointed, as follows:

The Federal Reserve System, established in 1913 as the nation's central bank, is composed of both public and private elements. In addition to the FOMC, the System includes the Board of Governors, the twelve regional Federal Reserve Banks, the Federal Advisory Council, and the approximately 5,500 pri-

---

ry, the ICC's rate increase, and a court order setting aside the increase, the court found standing:

"We cannot say on these pleadings that the appellees could not prove their allegations which, if proved, would place them squarely among those persons injured in fact by the Commission action...."

*Id.* at 690, 93 S.Ct. at 2417.

It seems reasonable that the Court of Appeals' invocation of equitable discretion in *Committee for Monetary Reform* was predicated upon a belief that some private plaintiffs could establish a causal connection—between their economic injuries and the composition of the FOMC—that was as strong as the causal connection accepted by *SCRAP.*

**11.** *See also Synar, supra.*

**1.** The defendants in this action are the five "private" members of the FOMC, the five alternate private members of the FOMC, and the FOMC. However, all of the defendants are represented by the Department of Justice.

**2.** Opinion of June 5, 1986. The Court there held that both constitutional and prudential requirements for standing were satisfied. After considering the decisions in *Riegle v. FOMC,* 656 F.2d 873 (D.C.Cir.1981), and *Committee for Monetary Reform v. Board of Governors,* 766 F.2d 538 (D.C.Cir.1985), the Court concluded that equitable discretion could not appropriately be applied to deny Senator Melcher standing, inasmuch as no private plaintiff is available to enforce the Appointments Clause. The Court also denied the government's application for a stay, and in a per curiam order dated June 24, 1986, the Court of Appeals denied the government's petition for a writ of mandamus and dismissed its emergency motion for a stay as moot.

vately owned commercial banks that are members of the System. Among the principal functions of the Federal Reserve System is the conduct of monetary policy, the aim of which is to promote national economic goals through influence on the availability and cost of bank reserves, bank credit, and money. The three primary means through which the System implements monetary policy are open market operations, regulation of member bank borrowing from the Federal Reserve Banks, and establishment of member bank reserve requirements.

The most important of these methods, open market trading—*i.e.*, the purchase and sale of Government securities in the domestic market—is exclusively the function of the FOMC. The Committee is composed of twelve members: the seven members of the Board of Governors of the Federal Reserve System, who are appointed by the President with the advice and consent of the Senate, and five representatives of the Federal Reserve Banks, who are elected annually by the boards of directors of the Banks from among the Banks' presidents and first vice presidents. The Federal Reserve Banks are private corporations whose stock is owned by the member commercial banks within their districts. The board of directors of each Reserve Bank consists of six members elected by the member commercial banks and three members appointed by the Board of Governors of the Federal Reserve System. The presidents and five vice presidents of the Reserve Banks are selected by the respective boards of directors but are subject to approval, suspension and removal by the Board of Governors. In short, the FOMC consists of seven members who hold their offices by virtue of presidential appointments confirmed by the Senate, and five members who are elected by Reserve Bank boards of directors, and who hold their offices sub-

ject to the approval of the Board of Governors.

*Committee for Monetary Reform v. Board of Governors of the Federal Reserve System*, 766 F.2d 538, 539–40 (D.C. Cir.1985) (footnotes omitted).

It is the presence on the FOMC of the five members who are elected by Reserve Bank boards of directors [3] that is at issue in this lawsuit. These five individuals are full voting members of the Committee, and as such they play an important role in the decisions of that body, including decisions aimed at regulating the nation's money supply. Plaintiff contends that public policy decisions of this kind may be made only by officials appointed by the President and confirmed by the Senate, in conformity with the Constitution's Appointments Clause. Accordingly, he asks the Court to declare section 263(a) unconstitutional and to enjoin the Reserve Bank members who have been selected pursuant to that section from voting or otherwise participating in the Committee's operations.

## II

The Appointments Clause provides that [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other Public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Constitution, Article II, § 2, cl. 2. Thus,

[a]n officer of the United States can only be appointed by the President, by and with the advice and consent of the Senate, or by a court of law, or the head of a

---

**3.** One Reserve Bank member of the FOMC is selected by the Boston, Philadelphia and Richmond banks; one by the Cleveland and Chicago banks; one by the Atlanta, Dallas and St. Louis banks; one by the Minneapolis, Kansas City, and San Francisco banks; and one by the New York bank.

department. A person who does not derive his position from one of these sources is not an officer of the United States in the sense of the Constitution. *United States v. Smith,* 124 U.S. 525, 532, 8 S.Ct. 595, 597, 31 L.Ed. 534 (1888) *(relying on United States v. Mouat,* 124 U.S. 303, 8 S.Ct. 505, 31 L.Ed. 463 (1888), and *United States v. Germaine,* 9 Otto 508, 99 U.S. 508, 25 L.Ed. 482 (1878)). Upon a review of the governing statute and of the applicable constitutional provisions, the Court has concluded, for the reasons discussed below, that the Reserve Bank members of the Federal Open Market Committee are not "Officers of the United States."

It is clear that the defendants were not appointed by the President. The question that arises next is whether, as the government contends, the defendants qualify under the method prescribed by the Appointments Clause for "inferior officers," that is, appointment by the heads of departments.[4]

The government argues that, since the Federal Reserve's Board of Governors has the power to approve, dismiss, and fix the compensation[5] of the Presidents and First Vice-Presidents of the various Reserve Banks,[6] the Reserve Bank members of the FOMC are under the effective control of the Board members, who unquestionably are principal officers of the United States, appointed by the President and confirmed by the Senate. 12 U.S.C. § 241.[7] It follows, the government maintains, that these members need not be nominated by the President and confirmed by the Senate. That argument is fallacious for several reasons.

First. It would be a distortion of language to label as "inferior officers" members of a body vested with the vast powers possessed by the Federal Open Market Committee. *Cf. McGrath v. United States,* 275 F. 294 (2d Cir.1921) (income tax inspectors appointed by the Commissioner of Internal Revenue are inferior officers); *United States v. McCrory,* 91 F. 295 (5th Cir. 1899) (letter carriers appointed by the postmaster general are inferior officers); *Chaplains for Army Hospitals,* 10 Op. Atty.Gen. 449 (1863) (chaplains of Army hospitals are inferior officers).

Second. The Reserve Bank FOMC members were not appointed by the Federal Reserve's Board of Governors but by the private Reserve banks in different parts of the country. For that reason, even if the members of the Board of Governors could collectively be analogized to the head of a government department, the "inferior officer" argument would not be materially strengthened.

Third. The Reserve Bank members sit on the FOMC with the Governors themselves, with the same opportunity to participate and vote as the Governors. *See generally,* 12 U.S.C. § 263(a); 12 C.F.R. § 272. The statutes governing the FOMC contain no suggestion that the Governors may supervise or otherwise influence the policy choices of the Reserve Bank members.

There is authority for the proposition that persons whose appointments must, by statute, be approved by the head of a department, are officers of the United States. *United States v. Hartwell,* 6 Wall. 385, 73 U.S. 385, 393–94, 18 L.Ed. 830 (1867). *See United States v. Smith, supra,* 124 U.S. at 532, 8 S.Ct. at 597. In other cases, the courts have been reluctant to treat government employees as constitutional officers when they were not actually selected by the President, a department head, or a court. *See United States v. Smith, supra,* 124 U.S. at 525, 8 S.Ct. at 595; *United States v. Mouat, supra,* 124 U.S. at 303, 8 S.Ct. at 505; and *United States v. Germaine,* 9 Otto 508, 99 U.S. 508, 25 L.Ed. 482 (1878).

---

**4.** Obviously, the defendants were not appointed by any court of law.

**5.** Additional authority solely vested in the Board which the government cites to support its argument include the powers to enforce civil penalties against member banks, to issue orders enjoining member banks from engaging in unsound practices, and to suspend or remove directors or officers of member banks.

**6.** 12 U.S.C. §§ 248(f), 341. Only Presidents and First Vice-Presidents of the several Reserve Banks are eligible for appointment to the FOMC. 12 U.S.C. § 263(a).

**7.** Accordingly, the government reasons, the Board members are equivalent to heads of departments, within the meaning of Article II, § 2.

Similarly, not even a hint of a suggestion exists that the power of the Board of Governors to remove officers of the Federal Reserve Banks was meant to be used by the Board to influence the votes of those officers who sit with them as members of the FOMC. To the contrary, the power of removal granted by 12 U.S.C. § 248(f) was to facilitate only the suspension or removal of Federal Reserve Bank officers for cause, a mechanism undoubtedly meant to encompass such infractions as misfeasance in office, but not a policy disagreement.

■ A holding that Reserve Bank members of the FOMC are inferior officers appointed by the Board of Governors thus would be at odds with the Committee's statutory mandate, its tradition of operation, and the plain language of Article II, § 2, cl. 2. For these reasons, the Court concludes that the Reserve Bank members of the FOMC are not "inferior officers" under the control of the governmental members of that body.

If the Reserve Board members of the Federal Open Market Committee are appointed neither by the President nor as "inferior officers" by someone having the authority to appoint such officers, they can validly sit on the Federal Open Market Committee only if membership thereon may constitutionally be granted to individuals other than officers of the United States, i.e., to private individuals selected by the Reserve banks. The Court now turns to that question.

### III

The issue whether private Reserve Board officers may validly be members of the FOMC turns upon whether the type of decisionmaking in which that body engages must constitutionally be performed by government officials, or whether, to the contrary, it may validly be performed, at least in part, by otherwise private individuals. Framed in these terms, it is apparent that the decisions primarily relied upon by the parties are only marginally, if at all, relevant to this lawsuit.

The cases principally cited—*Bowsher v. Synar*, —— U.S. ——, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), and *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)—dealt with congressional attempts to delegate executive powers to officers who were, in one fashion or another, beholden to the Congress. The Supreme Court, intent upon preserving the constitutional separation of powers imposed on the executive and legislative branches by the Founding Fathers, struck down what it regarded as congressional attempts to enlarge the legislative authority at the expense of that of the Executive Branch.

Here, by contrast, Congress has not sought to enhance its own power or to transgress the separation of powers. Instead, both it and the President[8] have in part committed open market trading (and thus indirectly a measure of the nation's monetary policymaking) to private individuals not appointed by or beholden to either branch of government. The issue thus presented—whether Congress has the constitutional power to commit Article I responsibilities to persons who are not officers of the United States[9]—appears to be one of first impression.[10]

■ When considering the constitutionality of a statute duly enacted by the Congress, the Court is obligated to move cautiously, and to avoid a declaration of inval-

---

**8.** President Franklin D. Roosevelt signed the 1935 statute, discussed *infra*.

**9.** It could of course alternatively be argued that Article I functions are not at all implicated: that the purchase and sale of government securities is a private activity having no significant relationship to governmental responsibilities. However, it would be to blind oneself to the obvious to disregard the fact that the FOMC's open market activities are designed under law to expand and contract the nation's money supply for significant public purposes.

**10.** However, in *Buckley v. Valeo, supra*, 424 U.S. at 139, 96 S.Ct. at 691, the Supreme Court noted that when a function is "sufficiently removed" from the administration and enforcement of the public law, the person performing it need not be an officer of the United States. *See also* note 26, *infra*.

idity if it is possible to do so. *See generally United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 571, 93 S.Ct. 2880, 2893, 37 L.Ed.2d 796 (1973); *United States v. Vuitch,* 402 U.S. 62, 70, 91 S.Ct. 1294, 1298, 28 L.Ed.2d 601 (1971); *Gomillion v. Lightfoot,* 364 U.S. 339, 343–44, 81 S.Ct. 125, 128–29, 5 L.Ed.2d 110 (1960); *Davis v. Bandemer,* —— U.S. ——, 106 S.Ct. 2797, 2798, 92 L.Ed.2d 85 (1986) (O'Connor, J., concurring). It is with that principle in mind that the Court examines the issue here.

▮ The textual source for plaintiff's claim that only officers of the United States may properly set monetary policy, let alone that only such officers may purchase or sell securities, is not obvious.[11] The Appointments Clause governs the selection of public officers—it says nothing about the exercise of public power by private persons. Nor has the Court's attention been drawn to any other provision of the Constitution that defines what may and what may not be left or delegated, in whole or in part, to private persons or entities. Hence, the Court is "dealing with claims under broad provisions of the Constitution," *Davis v. Bandemer, supra,* —— U.S. at ——, 106 S.Ct. at 2798 (O'Connor, J., concurring), where a judicial invalidation of Congress' legislative judgment must be grounded in a firm conviction that the Constitution's limitations have been transgressed. That conviction is not present here. In addition to the absence of precise textual authority for plaintiff's position,

there are the lessons of history which militate strongly against a conclusion that would rigidly exclude the private members from the FOMC.

## IV

Ever since the birth of this nation, the regulation of the nation's monetary systems has been governed by a subtle and conscious balance of public and private elements.

The First Bank of the United States, chartered in 1791,[12] was engaged in monetary policy (principally by demanding payments in specie from state banks or failing to press for such payment). Interestingly, while the Bank was to have an authorized capital stock of $10 million, the government was allowed to subscribe only one-fifth of that amount. Since the Bank's directors were elected by the stockholders, the leadership of the First Bank, much like that of the present-day FOMC, was chosen by both public and private interests, but with respect to the First Bank the private interests had a 4–1 majority.

The Second Bank of the United States—which exercised powers similar to those of the First[13]—continued under the law[14] with a mixed system of control. Five of its 25 directors were appointed by the President, by and with the advice and consent of the Senate. The remaining 20 directors were elected annually at the banking house in Philadelphia by the qualified stockholders of the corporation. A proposal to limit the choice of the Bank's president to one of the directors appointed by the President

---

**11.** As discussed below, plaintiff relies on Article I, section 8, clause 5 of the Constitution (coinage of money and regulation of its value) as authority for the congressional power to regulate the open market trading engaged in by the Federal Open Market Committee. However, such reliance does not answer the question whether non-governmental individuals may be used to execute the open market trading activities.

**12.** Act of February 25, 1791, 1 Stat. 191 ff. The bill to establish the First Bank was proposed by Alexander Hamilton who was emphatic in suggesting that it should be under private direction albeit with some governmental involvement.

See Report of the Secretary of the Treasury to the House of Representatives (Dec. 14, 1790), reprinted in 3 *The Works of Alexander Hamilton* 388, 427–31 (H. Lodge ed. 1903).

**13.** The Bank also exercised such monetary policymaking responsibilities as the manipulation of regional currency transfers and the sale and purchase of foreign issues. Redlick, *The Molding of American Banking* 132–34 (1957); *see generally* Hammond, *Banks and Politics in America from the Revolution to the Civil War* (1957).

**14.** Act of April 10, 1816, 3 Stat. 266 ff.

was defeated in Congress.[15] Although the manner of the selection of the bank's directors was not directly in issue, the fact is that the Bank survived a broad constitutional challenge in *McCulloch v. Maryland,* 4 Wheat. 316, 17 U.S. 316, 4 L.Ed. 579 (1819).

The charter of the Second Bank expired in 1836 and was not renewed. Various methods for dealing with national financial and monetary problems were employed during the next seventy-five years, including the establishment of an Independent Treasury System and the enactment of the so-called National Bank Act,[16] but the nation experienced repeated financial crises and consequently there was considerable agitation in favor of a more stable central system. Eventually new ideas and measures evolved, leading to the creation of the Federal Reserve System in 1913. However, the activities now vested in the FOMC—the sale and purchase of government securities to affect the money supply—were still not committed to any governmental official or body. To the contrary, in 1922 the private Reserve Banks created their own committee to coordinate their respective open market activities, and that is what the committee undertook to do.[17]

In the Banking Act of 1933,[18] Congress for the first time formally took cognizance of open market trading as such, creating a predecessor of the FOMC that, again, un-

like the present Committee, included *only* Reserve Bank members.[19] Finally, in 1935, the FOMC was constituted in its present form and with substantially [20] its present authority. While at that time some Members of Congress favored complete control of the Committee by the Board of Governors of the Federal Reserve Board, others sought to continue the then existing arrangement of private dominance. The present structure represents a compromise reached by legislators after airing "bitter differences."[21]

## V

Senator Melcher asks the Court to upset this deliberate, time-honored balance. He relies substantively upon Article I, § 8, cl. 5 of the Constitution, which empowers Congress to "coin money" and to "regulate the value thereof," suggesting that only public officials nominated by the President and confirmed by the Senate may carry out or participate in the carrying out of those responsibilities. The Court will assume, without deciding, that the open market trading activities of the FOMC fall within the scope of section 8, cl. 5. Even if that assumption is correct, however, it only establishes that Congress *may,* if it so elects, commit open market trading to an officer or officers of the Executive Branch. The Constitution does not, in terms, *require* Congress to do so.[22]

---

**15.** Debates and Proceedings in the Congress of the United States, 14th Cong., 1st Sess., pp. 1151–52.

**16.** 12 Stat. 637.

**17.** Burgess, *The Reserve Banks and the Money Market* 240 (1946). The following year, a federal open market investment committee established by the Federal Reserve Board was organized to make recommendations to the individual Reserve Banks.

**18.** 48 Stat. 162.

**19.** The powers of the Federal Open Market Committee as established by the 1933 act were only advisory in nature.

**20.** In 1942, when attempts had been made to elect officers of commercial banks as representatives of the Reserve Bank on the FOMC, an

amendment was adopted providing that only presidents or first vice presidents of Reserve Banks could be members of the FOMC. 12 U.S.C. § 263(a).

**21.** *See* 79 Cong.Rec. 11778 (1935) (remarks of Senator Glass, Chairman of the Senate Banking Committee). Chairman Steagall of the House Banking Committee noted that although the House had earlier expressed itself in favor of complete governmental control of open-market operations, the compromise was acceptable to him. 79 Cong.Rec. 13705–06 (1935).

**22.** As *McCulloch v. Maryland, supra,* teaches, Congress may select "any appropriate means" to carry out functions legitimately vested in the federal government. 17 U.S. at 409.

The broader issue, therefore, is whether under the Constitution, Congress may permit open market trading as an element of monetary policy to be exercised by private persons, or whether it is restricted in that regard to a grant of authority to government officials. In the opinion of this Court, Congress may validly leave dormant, or leave or delegate to private persons, at least some of its Article I, section 8, powers,[23] including the power to take measures to affect the supply of money.

This holding is necessarily narrow: the Court is not called upon to decide, and it does not decide, which of the powers entrusted to Congress by Article I, section 8, of the Constitution other than those directly implicated here may be delegated to private individuals. Indeed, many responsibilities may be so intrinsically governmental in nature that they may not be entrusted to a non-governmental entity.[24] Other responsibilities, unlike the functions at issue here, lack a history of private participation, and that fact may well make a significant difference in terms of any attempted delegation to individuals who are not officers of the government.[25] Finally, it is not necessary to decide, and the Court does not decide, whether Congress could at this time give to private persons the decisive voice with respect to such responsibilities as the money-management functions involved here.[26]

What is apparent is that the sale and purchase of government securities, like the sale and purchase of other financial instruments, can, as a practical matter, be performed by private individuals, and that it was so performed without direct governmental supervision or involvement for many years prior to 1935. To be sure, open market trading now has a profound impact on the nation's economic health; but that can also be said of other activities that are performed by private entities in whole or in part. In short, plaintiff has failed to offer any cogent reason why Congress may not establish or continue a partnership of public and private control over these functions[27] in lieu of execution of these responsibilities exclusively by government officials.[28]

## VI

Congress has employed its undoubted power to regulate the banking industry and

**23.** Congress has of course with some frequency exercised its power with respect to interstate commerce and other subjects to establish governmental agencies, only to abandon the effort later when it appeared to be no longer substantively or politically expedient, leaving the area thus vacated to state or private control or to no control. *E.g.,* National Recovery Administration (abolished by EO 7252 of December 21, 1935); Office of Alien Property (abolished by EO 11281 of May 13, 1966); Price Commission of the Economic Stabilization Program (abolished by EO 11695 of January 11, 1973).

**24.** *E.g.,* the powers to conduct foreign affairs or to establish military and naval forces.

**25.** As Justice Holmes has aptly observed, "[t]he life of the law has not been logic; it has been experience." Holmes, *The Common Law* 1.

**26.** As noted, seven of the twelve members of the FOMC are government officials, and the Board of Governors of the Federal Reserve Board has effective control over monetary policy, not the FOMC. *See* 12 U.S.C. §§ 341, 248(f), 341; 307. Moreover, as the Court of Appeals has said, the FOMC "in no way exercise[s] direct governmental authority." *Committee for Monetary Reform v. Board of Governors, supra,* 766 F.2d at 543-44. For example, it adjudicates no rights; it brings no lawsuits to enforce the law; and it does not direct the conduct of anyone other than its own members.

**27.** Public-private partnerships are not uncommon, having been employed in connection with such functions as mass transit (Amtrak), communications (Comsat), mortgage insurance (Federal National Mortgage Association) and assistance to members of the armed forces (American Red Cross). *See Irwin Memorial Blood Bank v. American National Red Cross,* 640 F.2d 1051 (9th Cir.1981).

**28.** The decision in *FOMC v. Merrill,* 443 U.S. 340, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979), to the effect that the Committee is an "agency" for Freedom of Information Act purposes is of course not conclusive with respect to the issue before the Court. *See Irwin Memorial Blood Bank v. American Red Cross, supra,* 640 F.2d at 1052; *Warren v. Government National Mortgage Association,* 611 F.2d 1229 (8th Cir.1980); *Dixson v. United States,* 465 U.S. 482, 498, 104 S.Ct. 1172, 1181, 79 L.Ed.2d 458 (1984).

the nation's money supply by a system that is in part private although it also includes significant avenues for decisive governmental influence. Few issues in the history of this nation have been as thoroughly considered and debated as central banking and the regulation of the money supply, and private participation, or even control, have been hallmarks of what was from time to time prescribed by the Congress. The current system is also the product of an unusual degree of debate and reflection within the Legislative Branch, with the participation from time to time of the Executive, and it represents an exquisitely balanced approach to an extremely difficult problem. To be sure, this background would not save the legislation if it clearly contravened the Constitution.[29] But the Court concludes on the basis of its consideration of all the factors discussed above, that, while the composition of the Federal Open Market Committee may be unusual, it is not unconstitutional.

The government's motion for summary judgment will be granted, and this action will be dismissed.

---

**29.** *See Bowsher v. Synar, supra; INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).